O

# United States District Court
# Central District of California

GCIU-EMPLOYER RETIREMENT FUND and BOARD OF TRUSTEES OF THE GCIU-EMPLOYER RETIREMENT FUND,

    Plaintiffs,

 v.

QUAD/GRAPHICS, INC.,

    Defendant.

Case № 2:16-cv-00100-ODW (AFMx)

**ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [56], DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [63], AND DISMISSING CERTAIN CLAIMS**

## I. INTRODUCTION

Plaintiffs GCIU-Employer Retirement Fund and Board of Trustees of the GCIU-Employer Retirement Fund (collectively "Fund") bring this action against Defendant Quad/Graphics, Inc. ("Quad") under the Employee Retirement Income Security Act of 1974 ("ERISA"). The Fund alleges that Quad failed to make interim payments on a withdrawal liability assessment, that Quad failed to make certain pension plan contributions, and that Quad failed to comply with a statutory request for documents. The Fund moves for partial summary judgment on its claim for interim payments, and Quad moves for summary judgment on the entire action. For the

reasons discussed below, the Court **GRANTS** the Fund's Motion and **DENIES IN PART** Quad's Motion.[1] (ECF No. 56, 63.) In addition, the Court *sua sponte* **DISMISSES** portions of the Fund's claims.

## II. BACKGROUND

The Fund is a multiemployer pension plan within the meaning of ERISA. (Fund SUF 2, ECF No. 67-1; Quad SUF 23, ECF No. 73-1.) Quad was previously obligated under several collective bargaining agreements to contribute to the Fund on behalf of the employees at its facilities in Versailles, Kentucky; Dickson, Tennessee; Waukee, Iowa; and Fernley, Nevada. (Fund SUF 3; Quad SUF 4–5.) In December 2010, employees at the Versailles facility voted to decertify the union that previously negotiated its collective bargaining agreement with Quad, thereby voiding the collective bargaining agreement entirely. (*See* Fund SUF 4.) This, in turn, cut off Quad's obligation to contribute to the Fund for the Versailles facility. (*See* Quad SUF 6; Fund SUF 4.) In 2011, Quad also ceased contributing to the Fund for the Dickson, Waukee, and Fernley facilities. (Quad SUF 7, 9.) On April 15, 2011, the Fund began auditing Quad's employment records all four facilities. (Quad SUF 25.) The audit did not reveal any "discrepancies" in Quad's contributions. (Coates Decl. ¶ 4, ECF No. 73-3.)[2]

The Fund assessed liability for a 2010 partial withdrawal for the Versailles facility and a 2011 complete withdrawal for Quad's other facilities (including Dickson, Waukee, and Fernley), and demanded payment on both assessments. (Quad

---

[1] After considering the papers in connection with the Motions, the Court deemed them appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

[2] There is some dispute about the purpose and scope of the audits. Quad asserts that the audits were intended to ensure that there were no underpayments in pension plan contributions during the life of the collective bargaining agreements. (*See* Knore Depo. at 53–59, ECF No. 64-1.) The Fund asserts that the audits were "spot checks" for the purposes of calculating withdrawal liability. (*See* Coates Decl. ¶¶ 2–4; Fund Response to SUF 26, 27, ECF No. 73-1.) The Court finds this dispute immaterial. Quad did not produce any evidence that the Fund suspected before the audit that Quad had underpaid contributions specifically for vacation time at these facilities, which the Court finds to be conclusive of the statute of limitations issue. (*See infra* pp. 11–12.)

SUF 7–9; Fund SUF 5.) Quad disputed the Fund's 2010 assessment, and the parties arbitrated the dispute. (Quad SUF 10–12; Fund SUF 6.) In the meantime, Quad made interim payments on both assessments. In May 2015, the arbitrator issued an "interim award" vacating the Fund's 2010 partial withdrawal assessment. (Quad SUF 13.) In July 2015, Quad ceased making interim payments on that assessment, arguing that the interim award was actually a "final decision" under 29 U.S.C. § 1401(d). (*See* Quad SUF 13; Fund SUF 7.) The Fund demanded that Quad continue making payments, but Quad refused. (Fund SUF 8.)

In September 2015, the Fund requested that the arbitrator clarify whether the May 2015 interim award was final or nonfinal. (Req. for Judicial Notice ("RJN"), Ex. 2, ECF No. 22.)[3] The arbitrator confirmed that the May 2015 award reflected his "intended but nonfinal resolution" of the 2010 partial withdrawal liability issue, and that the purpose of this interim/non-final designation was in part "to avoid the implication that [he] ha[d] lost some of [his] authority under *functus officio* principles to reconsider the pertinent nonfinal decision." (*Id.*) The arbitrator then reiterated that the award was "not intended . . . [to] be regarded as final . . . pursuant to ERISA." (*Id.*) The arbitrator also declined Quad's subsequent request to convert the May 2015 award into a partial final award. (RJN, Exs. 3–4; *see also* Procedural Order No. 11, Arbitration Record at 69–70, *GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*, Case No. 2:16-cv-03391-ODW (AFM), ECF No. 21-2.)

In November 2015, the Fund sent a request for information to Quad under 29 U.S.C. § 1399(a), seeking information relating to vacation time pay at the four facilities. (Quad SUF 34.) Quad refused to provide any such information, reasoning

---

[3] The Request for Judicial Notice that contains the documents supporting these facts was submitted by the Fund in connection with Quad's original motion to dismiss. (ECF No. 22.) The Court granted the Fund's request and took judicial notice of these documents. (Order at 3 n.2, ECF No. 32.) While neither party resubmitted these documents on summary judgment, the Court nevertheless finds it appropriate to rely on them here. *See* Fed. R. Evid. 201(c), (d) (court "may take judicial notice on its own" at any stage of the proceedings); *Callan v. N.Y. Cmty. Bank*, 643 F. App'x 666 (9th Cir. 2016) (no error where district court sua sponte took judicial notice of facts supported by documents not contained in the record).

that it was no longer an "employer" under ERISA and thus no longer obligated to comply with such requests. (*See* Quad SUF 35.)

On January 6, 2016, the Fund filed this action against Quad. (ECF No. 1.) The Fund asserted two claims: (1) failure to make interim payments on the 2010 withdrawal liability assessment; and (2) underpayment of vacation time contributions at the four facilities.[4] (*Id.*) Quad moved to dismiss the Fund's complaint, arguing in part that the arbitrator's May 2015 interim award actually constituted a final decision and thus cutoff Quad's obligation to continue making interim payments. (ECF No. 18.) The Court denied that portion of Quad's motion, concluding that the interim award did not constitute a final award until the arbitrator designated it as a final award. (Order at 7–9, ECF No. 32.)

On May 17, 2016, the arbitrator issued his final award on the entire arbitration proceedings, which adopted in full his prior decision to vacate the 2010 partial withdrawal assessment. (Quad SUF 19.) Both parties immediately filed civil actions in this Court to affirm and/or vacate the arbitrator's decision, and both parties subsequently moved to affirm and/or vacate opposing portions of the award. (*See generally GCIU-Employer Retirement Fund v. Quad/Graphics, Inc.*, Case No. 2:16-cv-03391-ODW (AFM); *Quad/Graphics, Inc. v. GCIU-Employer Retirement Fund*, Case No. 2:16-cv-3418-ODW (AFM).) While those motions were under submission, both Quad and the Fund filed their respective motions for summary judgment in this action, which the Court also took under submission without oral argument. (ECF Nos. 56, 63, 81.) The Court subsequently issued an order affirming in part and vacating in part the arbitrator's final award. (Order, *GCIU-Employer Retirement Fund*, Case No. 2:16-cv-03391-ODW (AFM), ECF No. 40.) In particular, the Court concluded that Quad had withdrawn from the Fund in 2010 rather than 2011, and thus reversed the arbitrator's decision vacating the 2010 partial withdrawal assessment. (*Id.* at 8–13.)

Both Quad's motion for summary judgment and the Fund's motion for partial

---

[4] Quad later added a sub-claim for failure to comply with 29 U.S.C. § 1399(a). (ECF No. 33.)

summary judgment in this action are now before the Court for decision.

### III. LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378.

### IV. DISCUSSION

The Fund asserts three claims in this lawsuit: (1) failure to make interim payments on the 2010 partial withdrawal assessment; (2) underpayment of vacation time contributions at Quad's four facilities; (3) failure to comply with the Fund's request for information under 29 U.S.C. § 1399(a).[5] The Fund moves for summary judgment on the first claim only; Quad moves for summary judgment on all claims. The Court addresses each claim in turn.

///

---

[5] While the Fund actually pleaded its § 1399(a) claim as part of its second claim for delinquent contributions, the Court will treat it as a separate claim for the purposes of this Order.

## A. Interim Payments

The Fund seeks a determination that Quad is liable for failing to make eleven interim payments on the 2010 partial withdrawal assessment between July 2015 (just after the arbitrator issued the interim award) and May 2016 (when the arbitrator issued the final award), and also seeks a determination of the amount of Quad's liability. Quad argues that it was not required to make interim payments after the arbitrator issued the interim award, that in any event it would be inequitable to require Quad to make interim payments, and that the Fund erroneously calculated the amount of Quad's liability. The Court addresses each issue in turn.

If an employer disputes a withdrawal liability assessment issued by a multiemployer pension plan, the employer must arbitrate the dispute with the plan. 29 U.S.C. § 1401(a)(1). However, the employer must make interim payments on the assessment at least until the arbitrator issues a "final decision" on the dispute. 29 U.S.C. §§ 1399(c)(2), 1401(d). If the employer fails to do so, the plan may file a civil action to collect or compel the interim payments. 29 U.S.C. § 1451(d); *see also, e.g.*, *Lads Trucking Co. v. Bd. of Trs. of W. Conference of Teamsters Pension Trust Fund*, 777 F.2d 1371, 1375 (9th Cir. 1985); *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 932 (9th Cir. 1986); *Debreceni v. Merchs. Terminal Corp.*, 889 F.2d 1, 6 (1st Cir. 1989) ("[T]he MPPAA empowers a court to order the making of interim withdrawal payments forthwith, notwithstanding the pendency of arbitration of a fund's withdrawal claim.").

### 1. Liability

To prevail on an action for interim payments, "[t]he plan sponsor must show that it notified the employer of the amount of liability, provided a schedule for liability payments, demanded payment in accordance with the schedule, and that the employer did not pay within 60 days after the demand." *Jorgensen v. Scolari's of Cal., Inc.*, No. SACV1401211CJCRNBX, 2014 WL 12481484, at *2 (C.D. Cal. Nov. 12, 2014); *see also Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 139 (3d Cir. 1997) ("The plan

sponsor need show only that it made a demand for interim payments under 29 U.S.C. § 1382 and that the payments were not made."). These elements are clearly satisfied here. On February 1, 2013, the Fund sent Quad a schedule of payments for the 2010 partial withdrawal assessment ($321,151.22 per month for twenty years) and demanded payment. Quad made interim payments on the assessment until May 2015. When Quad ceased making payments, the Fund sent a further demand to Quad to continue making payments, but Quad refused. Quad failed to make eleven interim payments before the arbitrator issued a final decision.

Quad does not dispute these facts, but rather makes two arguments why it is not liable for the eleven interim payments. First, it argues that the arbitrator's May 2015 interim award was actually a "final decision" within the meaning of 29 U.S.C. § 1401(d), thus cutting off its obligation to continue making interim payments. As Quad acknowledges, however, the Court previously concluded that the May 2015 award was not a "final award" within the meaning of § 1401(d). (Order at 7–9, ECF No. 32.) Under the "law of the case" doctrine, the Court cannot reconsider that ruling absent an applicable exception to the doctrine, *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997), and the Court concludes that no such exception applies.[6] Second, Quad argues that it would be inequitable for the Court to order it to make interim payments to the Fund because the Fund has a far greater obligation to refund to Quad prior interim payments on the now-rescinded assessment.[7] As the Fund notes, however, equity plays no part in the calculus when it comes to interim payments. *See Trustees of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 118 (7th Cir. 1991); *Debreceni v. Merchants Terminal Corp.*, 889 F.2d 1, 6 (1st Cir. 1989). Congress

---

[6] To the extent Quad suggests that the Court should overrule its prior decision because the arbitrator's final award adopted in full the substance of the interim award, the Court declines to adopt this type of hindsight approach. The fact that the arbitrator ultimately did not change his mind does not mean that the May 2015 award can become final retroactively.

[7] Quad made this argument prior to the Court's issuance of the order reversing the arbitrator's decision as to the 2010 partial withdrawal assessment.

determined—fairly or unfairly—that an employer must make interim payments on a withdrawal assessment until the issuance of a final decision; the fact that the particular circumstances of the case may make that payment seem unjust is not a defense. In any event, as the Court has now vacated the arbitrator's decision regarding the 2010 partial withdrawal assessment, the whole premise of Quad's argument—that the Fund currently owes Quad a far greater refund based on the arbitrator's ultimate decision—is moot. The Court therefore grants summary judgment in the Fund's favor on the issue of Quad's liability for the eleven unpaid interim payments.

### 2. Damages

The Fund argues that it is entitled to recover the outstanding interim payments, interest and liquidated damages as specified in the plan agreement, attorneys' fees, and costs. *See* 29 U.S.C. § 1132(g)(2). "In any action . . . to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." 29 U.S.C. § 1451(b); *see also Lads Trucking*, 777 F.2d at 1375 (holding that an action to collect interim payments is treated the same as an action to collect delinquent contributions).

Section 1132(g)(2) specifies the plan's remedy in an action to collect delinquent contributions:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan:
> (A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of--
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2). "For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26." *Id.* The remedies under § 1132(g)(2) apply to actions to collect delinquent withdrawal liability payments. *Carpenters Pension Trust Fund for N. Cal. v. Moxley*, 734 F.3d 864, 870 (9th Cir. 2013); *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 931 (9th Cir. 1986).

The undisputed evidence establishes that: (1) Quad failed to make eleven interim payments on the 2010 partial withdrawal assessment, totaling $3,532,663.42 (Fund SUF 15); (2) under the Fund's trust agreement, interest on any delinquent contributions is set at 10% of the unpaid contribution (Fund SUF 13); and (3) under the Fund's trust agreement, liquidated damages on any delinquent contributions is set at 20% of the unpaid contribution (Fund SUF 12).

Quad does not dispute that § 1132(g)(2) applies in actions to collect withdrawal liability payments. Quad instead argues that because the interest rate and liquidated damages provisions in the Fund's trust agreement relate only to "unpaid contributions" (and not expressly to withdrawal liability), the Court should not use those rates. Rather, Quad argues, the relevant interest rate is found under 29 C.F.R. § 4219.32, which provides a method for calculating interest on "overdue withdrawal liability payments." The Court does not find Quad's argument persuasive. In an action to recover delinquent withdrawal payments, ERISA treats such delinquent payments as equivalent to delinquent contributions. § 1451(b). Thus, the fact that the Fund's trust agreement specifies the interest rates and amount of liquidated damages only for delinquent contributions (and not expressly for withdrawal liability) is immaterial. Just as § 1132(g)(2) applies to withdrawal liability even though on its face it applies only to "unpaid contributions," the interest rate and liquidate damages provisions in the trust agreement apply to delinquent withdrawal payments even

though on their face they apply only to delinquent contributions. The fact that the obligation to contribute is contract-based and withdrawal liability is statute-based, *Moxley*, 734 F.3d at 870, does not make a difference here, because § 1451(b) makes the two obligations equivalent for collection purposes.

Moreover, even if the trust agreements did not specify an interest rate or liquidated damages, the Court is not convinced that it should look to 29 C.F.R. § 4219.32 for the interest rate. Section 1132(g)(2) expressly directs the Court to look to 26 U.S.C. § 6621 to calculate the interest owed in the absence of any applicable interest rate in the plan, *not* 29 C.F.R. § 4219.32. *See* 29 U.S.C. § 1132(g)(2). While some courts have nonetheless applied the interest rate under § 4219.32 in actions to recover delinquent withdrawal payments, *e.g.*, *Trs. of the Rd. Carriers Local 707 Pension Fund v. J.R.S. Trucking Servs., Inc.*, No. 15-CV-2444 (CBA), 2015 WL 10487716, at *7 (E.D.N.Y. Nov. 10, 2015); *Trs. of Local 813 Pension Trust Fund v. Frank Miceli Jr. Contracting, Inc.*, No. 13CV0198MKBJO, 2017 WL 972104, at *1 n.2 (E.D.N.Y. Mar. 13, 2017) (collecting cases), Quad does not point to any case (and the Court cannot find any) that convincingly explains why courts should apply § 4219.32 where the plain language of § 1132(g)(2) directs otherwise.[8] Rather, it appears to the Court that the interest calculation under § 4219.32 applies only where overdue withdrawal payments are collected before litigation commences. Once the Fund is forced to file an action to collect delinquent interim payments and obtains a

---

[8] In *Bd. of Trs. of Carpenter Trust Fund for N. Cal. v. JKJ, Inc.*, No. C 09-0636 PJH, 2010 WL 373819, at *8 (N.D. Cal. Jan. 29, 2010), the court noted the existence of this conflict, and ultimately applied the interest rates under § 4219.32. The court reasoned that § 4219.32 was specific to withdrawal liability, and thus it controlled over the more general damages provisions under § 1132(g)(2). *Id.* However, the court also noted that it was "effectively immaterial" in that case which statute it chose, the interest rates under both were "largely the same." *Id.* The Court disagrees that § 4219.32 is any more specific than § 1132(g)(2). Section 4219.32 certainly lays out a more complex method of calculating interest on withdrawal liability, but this is not the same as being more specific that § 1132(g)(2). Indeed, § 1132(g)(2) actually appears to be the more specific statute here—it applies specifically where withdrawal payments are delinquent *and* an action has been filed to recover such payments, whereas § 4219.32 applies where the withdrawal payments are simply "overdue."

judgment for such payments, the harsher remedies under § 1132(g)(2) apply. This is in keeping with the broader purpose of § 1132(g)(2) to discourage unnecessary litigation by the employer. *See United Auto. Workers Local 259 Soc. Sec. Dep't v. Metro Auto Ctr.*, 501 F.3d 283, 295 (3d Cir. 2007) ("§ 1132(g)(2) was enacted to encourage employers to make timely contributions, assist plans in their recovery of delinquent contributions, and discourage excessive litigation by defendants").

Because Quad does not otherwise dispute the Fund's calculation of interest and liquidated damages, the Court adopts those calculations.

**B.     Delinquent Contributions**

Quad argues that the Fund's claim for delinquent vacation time contributions is barred by the statute of limitations.

In an action to recover delinquent contributions, the court must apply the relevant state's statute of limitations for breach of contract claims. *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 297 (9th Cir. 1987). In California, the statute of limitations on a breach of contract claim is four years. Cal. Code Civ. Proc. § 337. "Because the cause of action is federal, however, federal law determines the time at which the cause of action accrues. Under federal law that time is when the plaintiff knows or has reason to know of the injury that is the basis of the action." *N. Cal. Retail Clerks Unions & Food Emp'rs Joint Pension Trust Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir. 1990). In contribution actions, "[t]he statute of limitations d[oes] not begin to run until the Trust Funds ha[ve] reason to know of the underpayment." *Id.*

Because expiration of the statute of limitations is an affirmative defense, Fed. R. Civ. P. 8(c), Quad must "carry its initial burden at summary judgment by presenting evidence affirmatively showing" that any reasonable factfinder would conclude that the claim is time-barred. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11-CV-246-IEG RBB, 2013 WL 2351814, at *3 (S.D. Cal. May 24, 2013). If Quad fails to

satisfy this burden, the Court must deny the motion even if the Fund produced no evidence at all in opposition. *See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

Because the Fund filed this action on January 6, 2016, Quad must show that the Fund "had reason to know" of the delinquent vacation time contributions prior to January 6, 2012. Quad has not done so. First, the fact that the Fund was "in possession" before January 2012 of the collective bargaining agreements that required such contributions does not mean that the Fund knew *how much* Quad was required to contribute each and every month. Each collective bargaining agreement required monthly pension plan contributions based on the vacation time used by or paid to the employee in that particular month. (Quad SUF 38–41.) Because the amount of vacation time each employee uses varies from month to month, contributions based on such vacation time must also vary from month to month. Similarly, end-of-year payouts of unused vacation time (and any contributions based thereon) will vary based on the amount of vacation time each employee accrued and used that year. As a result, simply having the agreements tells the Fund nothing about whether Quad underpaid contributions in any particular month or year. Second, the fact that the Fund "commenced" an audit for underpaid contributions on April 15, 2011, does not mean the claim accrued on that date. Quad presents no evidence that the audit would have immediately revealed unpaid vacation time contributions, or why the Fund should have looked to that issue first. Quad has therefore failed to meet its initial burden to demonstrate that any reasonable factfinder would conclude that the claim accrued on April 15, 2011.[9] Without this, Quad has failed to show that the claim is necessarily time-barred. The Court therefore denies summary judgment on the Fund's

---

[9] Quad also presents insufficient evidence for the Court to determine that the Fund had reason to know before January 6, 2012, of the underpaid vacation time contributions. That is, Quad does not point to any evidence in its moving papers explaining the audit process or the reasonable length of a pension plan audit, and thus the Court cannot say with any certainty that the Fund *must* have finished the audit and discovered the outstanding contributions by that date.

delinquent contribution claim.

## C. Violation of 29 U.S.C. § 1399(a)

In its complaint, the Fund asserts that it is entitled to seek information from Quad under § 1399(a) for two reasons: (1) to determine the amount of delinquent vacation time contributions for Quad's four facilities; and (2) to revise the withdrawal liability assessed against Quad based on the new "vacation deferral rule" that the arbitrator purportedly created when he vacated the 2010 partial withdrawal.[10] (*See* First Am. Compl. ¶ 68.) However, neither Quad's moving papers nor the Fund's opposing papers suggest that the § 1399(a) request has anything to do with delinquent contributions—all parties now appear to agree that the § 1399(a) request was only intended to gather sufficient information for the Fund to assess further withdrawal liability based on the purported "vacation deferral rule."

To the extent the Fund still contends that it may seek documents under § 1399(a) in order to determine the extent of Quad's delinquent contributions, the Court disagrees. That section requires an employer to furnish information upon request only if "the plan sponsor reasonably determines [the information] to be necessary to enable the plan sponsor to comply with the requirements of this part." 29 U.S.C. § 1399(a). "[T]his part" refers to withdrawal liability. *See id.* Audits and requests for information to determine delinquent contributions, on the other hand, are purely creatures of contract; "[t]here is no statutory basis for a plan's audit of a contributing employer." 3 ERISA Practice and Litigation § 12:13. Thus, the Fund cannot use § 1399(a) to compel production of information for the purposes of determining the amount of outstanding contributions.

---

[10] The arbitrator concluded that Quad's Versailles facility withdrew from the Fund in 2011 (despite the December 2010 decertification) because contributions based on unused vacation pay could not have been calculated until 2011. The Fund subsequently argued that it must now apply this principle to all of Quad's other facilities, which in turn would push the withdrawal date of those facilities into later plan years (thereby increasing the total withdrawal liability). (First Am. Compl. ¶¶ 25–28.) The Fund sent a § 1399(a) request to Quad seeking the information the Fund needed to calculate and issue revised withdrawal assessments in accordance with this new principle. (Opp'n at 21, ECF No. 73.)

To the extent the Fund seeks information under § 1399(a) to assess further withdrawal liability based on the arbitrator's "vacation deferral rule," the Court concludes that this issue is now constitutionally moot. On April 19, 2017, following the filing of the instant summary judgment motions, this Court vacated the arbitrator's conclusion that the Versailles facility withdrew in 2010, and entered a judgment to that effect. (*GCIU-Employer Retirement Fund*, Case No. 2:16-cv-03391-ODW (AFM), ECF Nos. 40, 45.) Consequently, there is no longer any "vacation deferral rule" that the Fund must or even could apply to Quad's other facilities, and no further withdrawal liability for the Fund to assess against Quad. Consequently, the claim concerning the § 1399(a) request is moot and must be dismissed. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (a claim is moot and must be dismissed "where a plaintiff no longer wishes—or is no longer able—to engage in the activity concerning which it is seeking declaratory relief").

The Court therefore *sua sponte* dismisses the § 1399(a) claim. *See Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987) ("A trial court may dismiss a claim sua sponte under [Rule] 12(b)(6). Such a dismissal may be made without notice where the claimant cannot possibly win relief." (citations omitted)); *In re Burrell*, 415 F.3d 994, 997 (9th Cir. 2005) ("[T]his court has an independent obligation to consider mootness *sua sponte*.").

### V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Fund's Motion for Partial Summary Judgment and **DENIES IN PART** Quad's Motion for Summary Judgment. The Court sua sponte **DISMISSES** the Fund's § 1399(a) request on the merits to the extent it was made for the purpose of determining delinquent contributions, and **DISMISSES AS MOOT** Fund's request to the extent it was made for the purpose of recalculating Quad's withdrawal liability.

/ / /

/ / /

The Court resets the trial date for the Fund's claim for delinquent contributions as follows:

| Event | Date |
|---|---|
| Bench Trial<br>Estimated Length: 2 days | 9/26/2017 at 9:00 a.m. |
| Last Date to File Final Trial Exhibit Stipulation | 9/21/2017 |
| Pretrial Conference<br>Hearing on Motions in Limine | 9/18/2017 at 1:30 p.m. |
| Deadline to File:<br>• Oppositions to Motions in Limine; | 9/11/2017 |
| Deadline to File:<br>• Proposed Pretrial Conference Order;<br>• Memoranda and Contentions of Fact and Law;<br>• Joint Witness List;<br>• Joint Exhibit List and Exhibit Stipulation;<br>• Proposed Findings of Fact and Conclusions of Law<br>• Joint Report re: Settlement<br>• Motions in Limine | 9/1/2017 |

**IT IS SO ORDERED.**

May 8, 2017

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**